ORIGINAL

FILED
APR 22 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

INFORMATION SCIENCES CORPORATION

Plaintiff

v.

THE UNITED STATES,

Defendant

08-304 C

**COMPLAINT**

Plaintiff, Information Sciences Corporation, complains of defendant, the United States of America and for its claims of relief against the defendant states as follows. This matter arises out of the General Services Administration's decision to award a sole source task order contract to Symplicity Corporation ("Symplicity") for the operation of Fedbizopps after terminating a competitive solicitation effort that covered four full years of effort. During those four years, the General Services Administration attempted on three successive occasions to award an eight year, fixed-price contract to Symplicity notwithstanding the fact that a majority of the GSA technical evaluation team rated Symplicity's proposal as "unacceptable" and presenting a "significant risk of unsuccessful contract performance." On the second attempt to award the contract to Symplicity, this Court found material and prejudicial violations of procurement law and regulations by the General Services Administration and ordered that a different source selection authority be appointed. On the third and most recent attempt, this Court again

found material and prejudicial violations of procurement law and regulations and ordered the General Services Administration to terminate the contract to Symplicity notwithstanding the fact that the General Services Administration had already spent an undisclosed amount of money having Symplicity develop its proposed but as yet unimplemented system. After this Court's most recent order, rather than extending the task order that would have allowed ISC to continue to operate Fedbizopps under its subcontract with a prime contractor, the General Services Administration, without prior notice to ISC or any of the other bidders, awarded a sole source task order to Symplicity under an 8(a) [Small Disadvantaged Business Development Program] contract to operate Fedbizopps for a yet undisclosed period of time. Symplicity is now operating Fedbizopps utilizing ISC's proprietary system without ISC's authorization or license and the General Services Administration has not explained or identified how or if it intends to recompete the solicitation tasks it began over four years ago. It is now obvious that the General Services Administration never had any intention of awarding a contract in response to the competitive solicitation issued four years ago to any other party other than Symplicity thereby creating a costly sham of the entire procurement process.

## I. Nature of the Action

1. This complaint seeks monetary damages resulting from the U.S. Government's violation of: (1) its mandatory regulations to "[c]onduct business with integrity, fairness, and openness" (FAR 1.102(b)(3); *see also* FAR 1.102-2(c)); and (2) its breach of its implied-in-fact contract to consider proposals fairly and honestly in the conduct of federal procurements.

## II. Parties

2. Plaintiff is Information Sciences Corporation ("ISC"), with its principal place of business in Kensington, Maryland.

3. Defendant is the United States, acting through the General Services Administration (the "Government" or "GSA").

## III. Jurisdiction

4. The Court of Federal Claims has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491. The Court of Federal Claims has jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract of any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C.§ 1491(b)(1). The Court of Federal Claims also has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress…or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

## IV. Venue

5. Venue is proper in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491.

## V. Background

6. Fedbizopps is the statutorily mandated single point of entry for the publication of all federal procurement opportunities over $25,000 in value. Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 5.102(a)(1). It is relied upon by small and large

businesses seeking contracting opportunities with the federal government both as prime contractors and subcontractors. The Fedbizopps system is the essential heart of the government's competitive procurement process and must operate with a very high degree of reliability in order for competitive procurements to occur on a daily basis. If the system were to lose this reliability, government contractors will be severely harmed in their ability to easily and effectively compete for government contracts and subcontracts.

7. As stated in Solicitation Number TQN-04-RA-0001 issued on May 18, 2004 and last amended in 2005, offerors were required to deliver and operate a system that supported the business process of serving as the single government-wide point of entry for federal agencies and contractors for federal procurement opportunities in a manner that is at least equal to or better than the then-current FBO system functionality. Offerors were required to meet a number of performance standards, such as interoperability with other government systems, and seamless transition with the current FBO system, and uninterrupted service as the single source for federal procurement activities during the transition period.

8. Other detailed Solicitation requirements included the delivery and operation of a robust system that could, at a minimum, support two million registered and 1,000 concurrent users, could store and archive one million total documents per year, and process sixty million page hits per month, that could store and process 50,000 new documents each month, and process each real-time data input transaction within two seconds. The system was required to provide live technical and end user support between the hours of 7:00 a.m. to 7:00 p.m. for the entire 8 year contract period—a 5 year base period with 3 one-year option periods. The system was also required to be reliable, by

preventing data loss (e.g., a backup and recovery system, mirrored systems), and by not exceeding 8 hours per twelve-month period of system down time (approximately 99.9% system availability), exclusive of scheduled down time. The system also was required to be expandable and allow for new technology insertion, and provide systems architecture that features low life-cycle support costs.

9. In addition to these minimum requirements, the Solicitation provided for two priced options for the new functional capabilities that an offeror was required to propose in its Technical and Price proposals. The options were: (1) incorporate the full functionality of the Federal Integrated Acquisition Environment System known as the "Federal Technical Data Solution (FedTeDS)," and (2) develop and deploy a comprehensive secured Electronic Proposal Receipt (EPR) Module.

10. ISC has extensive experience with the Fedbizopps system, having worked in partnership with Science Applications International Corporation ("SAIC") to develop and deliver this key government system. Fedbizopps, as developed by ISC, was an award-winning web-based system that allows prospective contractors to search for federal contracting opportunities by contracting agency, geographic area, federal procurement classification codes and set aside types, and by keyword.

11. The Fedbizopps system that ISC developed and had operated and maintained for nine years has been recognized as being highly successful by users. It currently has over 999,000 registered users, and handles over 54 million hits per month, an increase of 19 million hits from two years ago when the last award decision was made in 2005. A customer survey done by GSA's Inspector General gave the FBO system high marks for its performance in terms of both functionality and reliability, with 88% of participants

ranking the website positively and 86% identifying it as the only source they use to compete for Federal business opportunities.

12. The Fedbizopps system, as developed and maintained by ISC and its partner, SAIC, has been nominated for and received numerous awards. Fedbizopps was a finalist for the 2004 Government Technology Leadership Awards. It was selected by the Ash Institute for Democratic Governance and Innovation at Harvard University's Kennedy School of Government as one of the Top 10 Federal programs. In October 2003, Fedbizopps was selected as a GCN Agency Award winner for innovative IT accomplishment. Fedbizopps received the Intergovernmental Solutions Award presented by the Federation of Government Information Processing Councils.

13. The synopsis for the Solicitation at issue was publicized on March 1, 2004, and the Solicitation itself was originally issued on May 18, 2004. The original date for submission of offers was June 17, 2004. The Solicitation was amended seven times. Amendment 0001, dated May 14, 2000, withdrew the Solicitation and announced it would be re-posted at a later date. Amendment 0002 reissued an amended Solicitation on June 9, 2004, with offers due by June 17, 2004. On June 9, 2004, GSA posted answers to 199 questions, although not all questions were answered completely. Amendment 0003, dated June 10, 2004, extended the deadline for submission of proposals to June 24, 2004.

14. ISC timely submitted its proposal on June 24, 2004.

15. On November 15, 2004, ISC filed a protest at the Government Accountability Office ("GAO") alleging defects in the Solicitation because Amendment 0004, issued October 29, 2004, eliminated the mandatory date for delivery of a compliant system and did not account for the cost savings associated with an earlier delivery of a compliant

system. In taking corrective action as a result of that protest, GSA issued Amendment 0005 on November 24, 2004 and addressed one of the issues raised in ISC's protest by requiring the contractor to deliver a compliant system 120 days after contract award for testing and evaluation, and be prepared for full operation 150 days after contract award, and also extended the deadline for submission of proposals.

16. In taking further corrective action on the ISC protest, GSA issued Amendment 0006, on December 14, 2004, which modified the price evaluation and further extended the deadline for revised proposals to January 3, 2005.

17. In February 7, 2005, GSA requested Final Price Proposals after numerous rounds of discussions and proposals submissions. On February 9, 2005, ISC submitted a Final Price Proposal. Four months later, by correspondence dated June 17, 2005, ISC received notice of GSA's intent to award the contract to Symplicity Corporation ("Symplicity" or "awardee"). ISC received its mandatory debriefing on June 20, 2005. On June 24, 2005, ISC filed a post-award protest at GAO, raising a number of improper actions with the evaluation process. A protest was also filed by Developmental InfoStructure ("Devis"). By correspondence dated July 11, 2005, and Amendment 0007 of the same date, GSA took corrective action on one issue raised in the Devis protest involving security issues.

18. Amendment 0007 did not address the other two issues raised in the Devis protest nor any of the nine issues raised in the ISC GAO protest. Over the objection of both Devis and ISC, GAO nevertheless dismissed both protests on July 14, 2005 with instruction to GSA to preserve the record and a clarification that the issues raised by the protestors would still be timely with a new award decision.

19. On December 7, 2005, GSA notified ISC that it had confirmed its prior decision to select Symplicity for award of the FBO contract. According to GSA, Symplicity's evaluated price was $17.5 million. The government estimate for the 8 year, fixed-price contract was $52 million.

20. On December 22, 2005, ISC filed a protest in this Court. Case No. 05-1342C. After complete briefings and oral argument, the Court issued its published opinion on September 19, 2006 sustaining the protests due to GSA's violation of procurement regulations as a result of its failure to establish properly the competitive range in September 2004 and the Source Selection Authority's failure to document an independent decision.

21. The Court noted in its opinion regarding the GSA technical team's evaluation of Symplicity's proposal that:

> In the Majority Report, Symplicity was assigned an adjectival rating of "Unacceptable" and a confidence rating of "Little Confidence." *See* AR 813. The Majority Report summarized Symplicity's Proposal as follows: "The amount of resources to adequately manage and provide transition, maintenance, and support has been *grossly* underestimated by Symplicity and presents a *significant* risk of unsuccessful contract performance." *Id.* (emphasis added). Underlying the Majority Report's critique of Symplicity's plan was the observation that Symplicity underestimated the amount of human resources required to complete performance. *See* AR 813-37.
>
> The Majority Report documented several weaknesses and a few strengths under the "Technical Approach" Subfactor. *See* AR 815-31. For example, the Majority Report observed that Symplicity failed to propose a technical solution for handling the Central Contractor Registration ("CCR") exemptions to the FAR requirements and did not propose to integrate CCR information into the FBO system during the first 12 months of performance. *See* AR 815-16. The Majority Report also was concerned that Symplicity made "a number of unrealistic assumptions in their proposal...[which] suggest there could be numerous instance where Symplicity will claim htat various issue are out of scope as its proposal assumed they did not exist." AR 818. Regarding Symplicity's transition plan, the Majority Report explained that, "Symplicity appears not to have proposed the needed level of outreach for its seamless system transition...[T]he labor hours

proposed do not appear to be adequately [sic] to support the level of activity Symplicity is proposing for ongoing outreach and training." AR 829-30.

Assesing the Management Approach Subfactor, the Majority Report concluded that:

> Symplicity's proposed hours for labor over the entire 8-year project, cause concern about the level of effort forecasted by Symplicity. Minimal amounts of labor hours are proposed over the duration of the contract and they seem severely underestimated. First, Symplicty is proposing to migrate data with a System Engineer working only 120 hours in year one. This seems low considering the complexities necessary for a conversion the size of FBO[.]...Secondly, Symplicity is only proposing 90 hours for demonstration and training. This does not seem realistic since their technical approach includes the development of flash movies on the website for users to understand the new application....Finally, Symplicity is proposing a total of 220 hours for Business Process Analysis, which seems unrealistic.

* * *

Based on the analysis of the labor hours proposed[,] Symplicity's management approach could put the government at risk for increased costs over the lift of the contract.

AR 831-32 (footnotes omitted).

Info. Scis. v. United States, 73 Fed. Cl. 70, 81 (2006)

22. The Court issued a permanent injunction and set aside the award to Symplicity finding that the public interest favored injunctive relief. The Court stated: "[a]lthough the grant of injunctive relief will further delay GSA's procurement of a new contract, any such delay is outweighed by the public interest in ensuring that the ultimate awardee offers the 'best value' to the Government and that the GSA complies with the terms of the Solicitation and the applicable procurement regulations." *Id.* at 128.

23. The Court also ordered that a different Source Selection Authority be appointed in the event GSA decided to proceed with the procurement.

24. On October 3, 2006, GSA filed a Motion for Reconsideration of the Court's decision. That motion was denied on February 23, 2007.

25. On April 25, 2007, GSA issued a letter to ISC that notified ISC that it had been included in the competitive range and requested "an extension of your current proposal." That letter also stated: "[d]o not provide any other information, as discussions are closed." ISC was given two choices, either to extend the validity period of its proposal or withdraw its proposal.

26. According to GSA, the Contracting Officer, established a new competitive range based on the initial proposals received over three years ago in June 2004. However, notwithstanding the establishment of a competitive range based on initial proposals, no discussions with ISC were held.

27. On Friday, September 28, 2007, the last working day of Fiscal Year 2007, GSA announced the award of the contract to Symplicity for $17.5 million for the third time. The award was based on an offer submitted two and half years ago in February 2005.

28. On Monday, October 1, 2007 ISC submitted a written request for a debriefing. That debriefing was held on October 15, 2007 and consisted of the GSA contracting officer reading 14 PowerPoint slides to ISC. At the conclusion of the reading, ISC was allowed to submit written questions. ISC submitted 7 written questions.

29. Contracting agencies are required to award contracts pursuant to the factors and sub-factors contained in the Solicitation. In this case, GSA used the best value tradeoff process described in FAR, 48 C.F.R. § 15.101-1 (2005), which allows tradeoffs among price and non-price factors and allows the Government to accept a proposal that is neither the lowest cost proposal nor the highest technically rated proposal. The Solicitation identified four technical factors which were to be weighed against cost to

choose the winning proposal: Technical Approach, Management Approach, Past Performance, and Key Personnel Staffing and Experience. In addition, "Oral Presentation and Operational Capability Determination (OCD) Evaluation Factors" were to be incorporated into the offeror's technical evaluation and used to arrive at a final technical adjectival score.

30. Both an adjectival rating and a confidence rating were to be assigned for each factor, with each being of equal importance. The adjectival ratings were: Outstanding, Excellent, Acceptable, Marginal, and Unacceptable. The confidence ratings were: High Confidence, Significant Confidence, Confidence, Little Confidence, and No Confidence.

31. The Solicitation also included provisions allowing GSA to eliminate a proposal on the grounds of an unrealistically low price proposal, and requiring GSA to evaluate price in order to ensure that it is realistic in light of the proposed scope and effort.

32. Almost immediately after award, GSA issued modifications to Symplicity's contract. ISC was unaware of the existence of any modification to the contract until after the Court's hearing held on November 29, 2007. The second of these modifications, Modification PS02 ("Modification 2") effective November 8, 2007, was provided to counsel for ISC on December 10, 2007, in response to the Court's December 3rd order.

33. Modification 2 amended Symplicity's contract by removing a requirement to use BEA WebLogic and Java and mysteriously added a new section on payment, G.5 which stated: "G.5 Payment Invoicing and Payment will be performed on a monthly basis, and Invoices will reflect 1/12th of the yearly fixed price amount." Previously, Section G of the solicitation ended with paragraph G.4, Invoice/Voucher. The new

paragraph G.5 was apparently negotiated between GSA and Symplicity in order to address the fact that Symplicity wanted to paid on an on-going basis rather than the milestone basis that was required in the solicitation for delivery of actual services. Section L.8.3.4 states in relevant part: "Offerors shall propose, in the price proposal, a milestone schedule for performance based payments tied to deliverables. The successful offeror's schedule, after acceptance by the Government will be the basis for pricing in Section B." Section M.6 of the evaluation factors section of the solicitation repeats these instructions and states in relevant part: "Offerors shall propose, in the price proposal, a milestone schedule for performance based payments tied to deliverables. The successful offeror's schedule, after acceptance by the Government will be the basis for pricing in Section B."

34. Following the disclosure of Modification 2 during the third protest, the General Services Administration, without explanation but apparently based on upon the realization that the amendment constituted improper activity, issued Modification PS03, which it provided to the parties on December 14, 2007. Modification PS03 rescinded Modification PS02 in its entirety. Modification 3 did not, however, delete Section G.5 from Symplicity's contract.

35. Payment to Symplicity according to a monthly schedule pursuant to the new Section G.5 improperly reallocated the risk of performance in this performance based contract by providing for monthly payment regardless of performance criteria in violation of this Court's precedent.

36. During the consideration of the third protest by this Court and while Symplicity was being paid to develop its competing system, GSA continually sought

ISC's proprietary information. As a result, ISC was forced to seek this Court's intervention twice to prevent these improper demands.

37. After a full briefing by the parties and oral argument, this Court again found that GSA had violated procurement law and regulations.

38. In its March 18, 2008 decision, this Court stated:

> The new SSA [Source Selection Authority], however, erroneously concluded that "*ISC and Symplicity both received similar technical adjectival ratings.*" AR 2561 (emphasis added). First, the new SSA was not authorized to change the ratings of the Technical Team. The new SSA;s job was to *compare* the *existing technical ratings of the technical professionals* with the price analysis and incentive pan analysis and conduct a "best value" analysis....In making his own independent assessment of the technical ratings, the new SSA reached a conclusion that is not supported by the record.
>
> * * *
>
> The new SSA's misperception of the technical ratings of ISC and Symplicity is even more apparent whtn the Majority Report's textual explanation is reviewed. *Compare* AR 774 (April 5, 2007 Final Technical Assessment Report Summary for ISC) ("ISC's proposal *can be expected* to produce a result that is very similar to the existing FBO. The new functionality...includes features that, while *improving the current FBO system,* are generally considered standard in contemporary web applications.") (emphasis added); *with* AR 813 (April 5, 2007 Final Technical Assessment Report Summary of Symplicity) ("Symplicity had proposed to build an application, install it on servers, keep the servers running, and answer the Help Desk phones. There is *little to no support* for outreach, training, or agency transition to a significantly different FBO. The *amount of resources* to adequately manage and provide transitions, maintenance, and support has been *grossly underestimated...* and presents a *significant risk of unsuccessful contract performance.*") (emphasis added.) Therefore, contrary to the SSA's assertion, ISC's overall technical ratings and capabilities were superior to Symplicity's.

Info. Scis. v. United States, No. 07-744C at 41-43 (Fed. Cl. filed March 18, 2008).

39. In issuing injunctive relief, with regard to the balance of hardships, this Court stated:

> Although an injunction would delay GSA's effort to "acquire a contractor for comprehensive development, implementation, transition, operations[,] and support of a new Fedeal Business Opportunities (FB))system (*see* AR 89), GSA

> has not indicated that a further delay in awarding the contract would threaten the continued operation of that FBO system, even if it may delay some enhancements....In sum, the additional time and expense involved in requiring GSA to solicit and award the FBO contract is outweighed by the importance of this procurement being conduced in compliance with the law.

*Id.* at 53.

40. In issuing injunctive relief, with regard to the public interest and notwithstanding Symplicity's argument as cited by the Court that: "[i]t is a fair assumption that should this Court grant the relief requested and either DEVIS [another offeror] or ISC prevail in a subsequent source selection decision, then a fourth, fifth or sixth protest will surely follow", this Court stated: "[t]hese concerns are outweighed by the public interest of ensuring that the ultimate awardee offers the 'best value' to the Government, pursuant to the terms of the Solicitation and applicable procurement regulations." *Id.*

41. This Court also noted that GSA had made "significant modifications" to Symplicity's contract immediately after award and then "GSA revoked Modification 2 when the court became aware of this action....The court discerns no reason why GSA cannot issue a revised Solicitation and award an FBO Contract that fully complies with the Solicitation and all applicable provisions." *Id.* at 54

42. This Court went on to state:

> GSA's leadership has stated that:
>
> GSA customers know when they use GSA contract vehicles they get the best value in price and service. With the "Get It Right" plan, these customers are being reassured that, along with the best prices and value, they are using a procurement system that is managed with the highest standards of ethics, effectiveness, and efficiency available.
>
> GSA, *Confidence in Contracting* (July 13, 2004)(quoting GSA Administrator Stephen A. Perry); *see also* Statement of Emily W. Murphy, GSA Chief

> Acquisition Officer, S. Com. Homeland Sec'y & Gov't Affairs, Subcomm. Fed. Fin. Mgmt., Govt' Info. & Int'l Sec'y (July 26, 2005)("GSA's mission and achievements are very important to the efficiency and effectiveness of the Federal government, and that we make a difference in the process of delivering good government services, and to the well-being of people who live in this country…GSA is the premier acquisition agency of the Federal government[.] (footnotes omitted).
>
> The court is confident that GSA can "Get It Right" by re-issuing a revised Solicitation, and awarding the FBO Contract in a manner that complies with the procedural and substantive requirements of the FAR, as soon as possible.

*Id.*

43. However, rather than maintaining the status quo and a reliable Fedbizopps system while engaging in an acquisition process that complies with procurement statutes and regulations, GSA, without notification to ISC, simply awarded a sole source contract to Symplicity to operate Fedbizopps. This award was made through the GSA government-wide acquisition contract known as "8(a) STARS – Streamlined Technology Acquisition Resources for Services" a contract vehicle that is reserved for registered disadvantaged businesses and that allows sole source awards up to $3.5 million in value.

44. Up until the evening of March 31, 2008, ISC operated Fedbizopps under a task order awarded to SAIC.

45. On April 1, 2008, Symplicity began operation of Fedbizopps and utilized the intellectual property and proprietary software code of ISC that remained on the computer system at GSA without the authorization or a license from ISC.

46. ISC spent an estimated $1.6 million in proposal preparation and responding to the various amendments and request for final proposal revisions in this four year procurement. It is now evident that GSA, having three times tried to award a contract to Symplicity and having failed to properly do so three times, never intended, with regard to

this procurement, to "conduct business with integrity, fairness, and openness" as required by FAR 1.102.

47. In addition, ISC has suffered significant financial loss because of the disclosure of its trade secrets to Symplicity by GSA as well as the unlicensed use of its proprietary code.

## VI. Causes of Action

### 1. Breach of Mandatory Requirement to Conduct Business With Integrity, Fairness, And Openness

48. Plaintiff incorporates by reference the allegations in paragraphs 1 through 47 above.

49. Plaintiff has standing in this matter as it is a responsible small business offeror and submitted a compliant proposal in response to the Solicitation and Amended Solicitation.

50. Defendant, as an executive branch agency spending appropriated funds, is subject to the Federal Acquisition System and the Federal Acquisition Regulation.

51. As part of its obligations under the Federal Acquisition System, Defendant, operating through its duly authorized procurement officials and contracting officers, is required to "[c]onduct business with integrity, fairness, and openness" (FAR 1.102(b)(3)) which requires "open communication among team members, internal and external customers, and the public" (FAR 1.102-2(c)(1)).

52. Defendant failed in its duty when it failed to consider Plaintiff's proposal fairly and honestly and not in an arbitrary and capricious manner during consideration of Plaintiff's proposal in response to the Solicitation.

53. Defendant failed again in its duty when it failed to consider Plaintiff's proposal fairly and honestly and not in an arbitrary and capricious manner in response to the Amended Solicitation and chose instead to utilize a sole source contract vehicle to award the contract rather than pursuing a proper and lawful course of action consistent with the stated intent in 2004 of holding a competitive procurement in compliance with the requirements of the Competition in Contracting Act.

54. Plaintiff invested a substantial amount of money, time and effort to submit its proposals and related information to GSA. These resources have all been wasted because of Defendant's breach of its duty of conducting business with integrity, fairness, and openness.

55. Plaintiff spent an estimated $1,625,000 in preparing for the procurement, submitting an initial proposal, submitting revised proposals, and participating in numerous required procurement activities. Plaintiff is entitled to these costs as damages from the government resulting from the breach of its duty of conducting business with integrity, fairness, and openness.

**2. Breach of Implied-In-Fact Contract**

56. Plaintiff incorporates by reference the allegations in paragraphs 1 through 49 above.

57. Plaintiff has standing in this matter as it is a responsible small business offeror and submitted a compliant proposal in response to the Solicitation and Amended Solicitation.

58. Defendant, when its duly authorized officials, issued a formal, written Request for Proposals, impliedly promised that it would consider all proposals received in a fair and honest manner.

59. In consideration of Defendant's promise, Plaintiff submitted compliant proposals in response to the Solicitation and Amended Solicitation.

60. GSA breached its implied-in-fact contract with Plaintiff when at the same time it was encouraging Plaintiff to submit compliant proposals and revised proposals and actively participate in the solicitation process, it was making the determination, without any notice to Plaintiff, to cancel the Solicitation and Amended Solicitation and chose instead to utilize a sole source contract vehicle to award the contract rather than pursuing a proper and lawful course of action consistent with the stated intent in 2004 of holding a competitive procurement in compliance with the requirements of the Competition in Contracting Act.

61. Plaintiff spent an estimated $1,625,000 in preparing for the procurement, submitting an initial proposal, submitting revised proposals, and participating in numerous required procurement activities. Plaintiff is entitled to these costs as damages from the government resulting from the breach of its duty of conducting business with integrity, fairness, and openness.

## VII. Damages

62. Plaintiff suffered total damages in the amount of $1,625,000 due to the Government's violation of procurement statutes, regulations and its implied-in-fact contract that includes employee time, labor, material, and expert time involved in pursuing the Solicitation and Amended Solicitation.

**VIII. Prayer for Relief**

WHEREFORE, Plaintiff prays for relief as follows:

1. Judgment against the United States in a total amount of $1,625,000.00.

2. Attorneys fees in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412.

3. Other monetary and injunctive relief the Court determines is appropriate.

Respectfully submitted,

William A. Shook
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1601 K Street NW
Washington, DC 20006
Tel: (202) 661-6256
Fax: (202) 778-9100
bill.shook@klgates.com

Date: April 22, 2008