**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| | ) | |
| INFORMATION SCIENCES CORP. | ) | |
| | ) | |
| Plaintiff | ) | No. 08-304 |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ___________________________________ | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**........... 1

**STATEMENT OF THE ISSUES**........................................................................ 2

**STATEMENT OF THE FACTS** ....................................................................... 2

**ARGUMENT**.................................................................................................. 12

**I. Legal Standard**........................................................................................ 12

**II. Standard of Review**................................................................................ 13

**III. The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Is Mandatory And Was Violated In This Instance** ........................ 15

**IV. The Implied-In-Fact Contract Of Good Faith And Fair Dealing, Identified By The Court of Claims Some 50 Years Ago, Has Not Been Eliminated By Statute Or The Courts** ........................................................................................... 18

**V. Defendant's Reliance On The Passage Of ADRA For The Elimination Of This Court's Jurisdiction In This Instance Is Misplaced**....................................... 22

**VI. ISC Has Properly Stated A Claim For Which Relief May Be Granted**......... 30

**CONCLUSION** ............................................................................................. 32

# TABLE OF AUTHORITIES

## CASE LAW

Aero Corp. v. United States,
38 Fed. Cl. 739 (1997) ....22

Biltmore Forest Broad. FM, Inc. v. United States,
80 Fed. Cl. 322 (2008) ....22

Block v. United States,
66 Fed. Cl. 68 (2005) ....22

Chevron U.S.A., Inc. v. United States,
71 Fed. Cl. 236 (2006) ....13, 31

Celtech, Inc. v. United States,
24 Cl.Ct. 269 (1991) ....20

Comprehensive Health Services, Inc. v. United States,
70 Fed. Cl. 700 (2006) ....14, 15

DeLaughter v. United States Postal Serv.,
3 F.3d 1522 (Fed. Cir. 1993)....16

Dynacs Eng'g Co., Inc. v. United States,
48 Fed. Cl. 124 (2000) ....15

Esch v. United States,
77 Fed. Cl. 582 (2007), ....13

Forestry Surveys & Data v. United States,
44 Fed. Cl. 485 (1999) ....22

Guillebeau v. Dep't of the Navy,
362 F.3d 1329 (Fed. Cir. 2004)....16

Hamilton Sundstrand Power Sys. v. United States,
75 Fed. Cl. 512 (Feb. 21, 2007) ....22

Henke v. United States,
60 F.3d 795 (Fed. Cir. 1995)....13

Hewitt v. Helms,
459 U.S. 460 (U.S. 1983)....17

Heyer Products Co., Inc. v. United States,
140 F.Supp. 409, 135 Ct.Cl. 63 ........ 18, 19

Hunt Bldg. Co. v. United States,
61 Fed. Cl. 243 (2004) ........ 23

HWA, Inc. v. United States,
78 Fed. Cl. 685 (2007) ........ 23

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) ........ 23

Info. Sciences Corp. v. United States,
73 Fed. Cl. 70 (2006) ........ 5, 6, 21

Info. Sciences Corp. v. United States,
80 Fed. Cl. 759 (2008) ........ 10, 21

Kawa v. United States,
77 Fed. Cl. 294 (2007) ........ 13

Keco Indus., Inc. v. United States,
203 Ct. Cl. 566, 492 F.2d 1200 (1974) ........ 14

L-3 Commc'ns Integrated Sys. v. United States,
79 Fed. Cl. 453 (2007) ........ 19, 23

Lion Raisins, Inc. v. United States,
52 Fed. Cl. 629 (2002) ........ 22

Phoenix Air Group v. United States,
46 Fed. Cl. 90 (2000) ........ 23

S.K.J. & Associates, Inc. v. United States,
67 Fed. Cl. 218 (2005) ........ 22

Scanwell Laboratories, Inc. v. Shaffer,
424 F.2d 859, 137 U.S. App. D.C. 371 (1969) ........ 26, 27

Standard Mf. Co., Inc. v. United States,
7 Cl.Ct. 54 (1984) ........ 20

Unified Architecture & Eng'g, Inc. v. United States,
46 Fed. Cl. 56 aff'd, 251 F.3d 170 (Fed. Cir. 2000) ........ 23

United States v. The Donruss Co.,
393 U.S. 297 (1969)....25

**FEDERAL STATUTES AND REGULATIONS**

28 U.S.C. § 1491(a)(1)....1, 30

28 U.S.C. § 1491(b)(1) ....11

28 U.S.C. § 1491(b)(2) ....9

48 C.F.R. § 1.102 ....11

48 C.F.R. § 15.101-1 (2005)....5

48 C.F.R. § 5.102(a)(1)....1

5 U.S.C. § 706....8

Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320,
110 Stat. 3870 (1996)....1

Federal Courts Improvement Act of 1982 ("FCIA"), Pub. L. No. 97-164 ....6

**MISCELLANEOUS**

142 Cong. Rec. S6155-56 (June 12, 1996) ....30

142 Cong. Rec. S6156-57 (June 12, 1996) ....26, 27, 29

60 Fed. Reg. 34732 ....1

60 Fed. Reg. 4205 ....1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| INFORMATION SCIENCES CORP.<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 08-304<br>(Judge Braden) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Information Sciences Corp. ("ISC") hereby respectfully submits its Opposition to Defendant's Motion to Dismiss pursuant to Rule 12(b)(1) and in the alternative pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims.

At this point, the facts leading up to this matter are well-known to this Court. Defendant, through the General Services Administration ("GSA") spent four years seeking competitive proposals from plaintiff as part of a proposal process. On three successive occasions, Defendant awarded a contract to Symplicity Corporation ("Symplicity"). On three successive occasions, two of them before this Court, Defendant failed to follow procurement laws and regulations in making that award. Having failed for a third time, Defendant simply chose to award a task order without competition to Symplicity via an alternative procurement vehicle, the GSA Streamlined Technology Acquisition Resources for Services ("STARS") contract—thereby achieving GSA's long-sought award determination. Information Sciences Corp. ("ISC") now seeks to recover

its costs of preparing its proposal and pursuing the contract that GSA had long-determined not to award to ISC—damages directly resulting from the GSA's breach of mandatory regulations that require it to "[c]onduct business with integrity, fairness, and openness" (FAR 1.102) and the breach of the implied-in-fact contract to consider its proposal fairly and honestly—actions that GSA did not do when it consistently violated the law and then failed to give ISC a chance to compete fairly for the work after having initially decided to begin a competitive process.

## STATEMENT OF THE ISSUES

1. Whether the requirements stated at FAR 1.102(b)(3) and FAR 1.102-2(c)(1) to conduct business with integrity, fairness, and openness are mandatory requirements for Defendant.

2. Whether this Court has jurisdiction over the alleged breach of an implied-in-fact contract to consider ISC's proposal fairly and honestly.

## STATEMENT OF THE FACTS

Fedbizopps is the statutorily mandated single point of entry for the publication of all federal procurement opportunities over $25,000 in value. Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 5.102(a)(1).

As stated in Solicitation Number TQN-04-RA-0001 issued on May 18, 2004 and last amended in 2005, offerors were required to deliver and operate a system that supported the business process of serving as the single government-wide point of entry for federal agencies and contractors for federal procurement opportunities in a manner that is at least equal to or better than the then-current FBO system functionality.

ISC has extensive experience with the Fedbizopps system, having worked in partnership with Science Applications International Corporation ("SAIC") to develop and deliver this key government system. Fedbizopps, as developed by ISC, was an award-winning web-based system that allows prospective contractors to search for federal contracting opportunities by contracting agency, geographic area, federal procurement classification codes and set aside types, and by keyword.

The synopsis for the Solicitation at issue was publicized on March 1, 2004, and the Solicitation itself was originally issued on May 18, 2004. The original date for submission of offers was June 17, 2004. The Solicitation was amended seven times. Amendment 0001, dated May 14, 2004, withdrew the Solicitation and announced it would be re-posted at a later date. Amendment 0002 reissued an amended Solicitation on June 9, 2004, with offers due by June 17, 2004. Amendment 0003, dated June 10, 2004, extended the deadline for submission of proposals to June 24, 2004.

ISC timely submitted its proposal on June 24, 2004.

On November 15, 2004, ISC filed a protest at the Government Accountability Office ("GAO") alleging defects in the Solicitation because Amendment 0004, issued October 29, 2004, eliminated the mandatory date for delivery of a compliant system and did not account for the cost savings associated with an earlier delivery of a compliant system. In taking corrective action as a result of that protest, GSA issued Amendment 0005 on November 24, 2004 and addressed one of the issues raised in ISC's protest by requiring the contractor to deliver a compliant system 120 days after contract award for testing and evaluation, and be prepared for full operation 150 days after contract award, and also extended the deadline for submission of proposals.

In taking further corrective action on the ISC protest, GSA issued Amendment 0006, on December 14, 2004, which modified the price evaluation and further extended the deadline for revised proposals to January 3, 2005.

On February 7, 2005, GSA requested Final Price Proposals after numerous rounds of discussions and proposals submissions—all of which were engaged in by ISC. On February 9, 2005, ISC submitted a Final Price Proposal. Four months later, by correspondence dated June 17, 2005, ISC received notice of GSA's intent to award the contract to Symplicity Corporation ("Symplicity" or "awardee"). ISC received its mandatory debriefing on June 20, 2005. On June 24, 2005, ISC filed a post-award protest at GAO, raising a number of improper actions with the evaluation process. A protest was also filed by another offeror, Developmental InfoStructure ("Devis"). By correspondence dated July 11, 2005, and Amendment 0007 of the same date, GSA took corrective action on one issue raised in the Devis protest involving security issues.

Amendment 0007 did not address the other two issues raised in the Devis protest nor any of the nine issues raised in the ISC GAO protest. Over the objection of both Devis and ISC, GAO nevertheless dismissed both protests on July 14, 2005, with instruction to GSA to preserve the record and a clarification that the issues raised by the protestors would still be timely with a new award decision.

On December 7, 2005, GSA notified ISC that it had confirmed its first decision to select Symplicity for award of the FBO contract. According to GSA, Symplicity's evaluated price was $17.5 million. The government estimate for the 8 year, fixed-price contract was $52 million.

On December 22, 2005, ISC filed a protest in this Court. Case No. 05-1342C. After complete briefings and oral argument, the Court issued its published opinion on September 19, 2006, sustaining the protest due to GSA's violation of procurement regulations as a result of its failure to establish properly the competitive range in September 2004 and the Source Selection Authority's failure to document an independent decision. Info. Sciences Corp. v. United States, 73 Fed. Cl. 70 (2006).

The Court noted in its opinion regarding the GSA technical team's evaluation of Symplicity's proposal that:

> In the Majority Report, Symplicity was assigned an adjectival rating of "Unacceptable" and a confidence rating of "Little Confidence." *See* AR 813. The Majority Report summarized Symplicity's Proposal as follows: "The amount of resources to adequately manage and provide transition, maintenance, and support has been *grossly* underestimated by Symplicity and presents a *significant* risk of unsuccessful contract performance." *Id*. (emphasis added). Underlying the Majority Report's critique of Symplicity's plan was the observation that Symplicity underestimated the amount of human resources required to complete performance. *See* AR 813-37.
>
> The Majority Report documented several weaknesses and a few strengths under the "Technical Approach" Subfactor. *See* AR 815-31. For example, the Majority Report observed that Symplicity failed to propose a technical solution for handling the Central Contractor Registration ("CCR") exemptions to the FAR requirements and did not propose to integrate CCR information into the FBO system during the first 12 months of performance. *See* AR 815-16. The Majority Report also was concerned that Symplicity made "a number of unrealistic assumptions in their proposal…[which] suggest there could be numerous instances where Symplicity will claim that various issues are out of scope as its proposal assumed they did not exist." AR 818. Regarding Symplicity's transition plan, the Majority Report explained that, "Symplicity appears not to have proposed the needed level of outreach for its seamless system transition…[T]he labor hours proposed do not appear to be adequately [sic] to support the level of activity Symplicity is proposing for ongoing outreach and training." AR 829-30.
>
> Assessing the Management Approach Subfactor, the Majority Report concluded that:

> Symplicity's proposed hours for labor over the entire 8-year project, cause concern about the level of effort forecasted by Symplicity. Minimal amounts of labor hours are proposed over the duration of the contract and they seem severely underestimated. First, Symplicity is proposing to migrate data with a System Engineer working only 120 hours in year one. This seems low considering the complexities necessary for a conversion the size of FBO[.]…Secondly, Symplicity is only proposing 90 hours for demonstration and training. This does not seem realistic since their technical approach includes the development of flash movies on the website for users to understand the new application….Finally, Symplicity is proposing a total of 220 hours for Business Process Analysis, which seems unrealistic.
>
> * * *
>
> Based on the analysis of the labor hours proposed[,] Symplicity's management approach could put the government at risk for increased costs over the life of the contract. AR 831-32 (footnotes omitted).

Info. Sciences Corp. v. United States, 73 Fed. Cl. 70, 81 (2006).

The Court issued a permanent injunction and set aside the award to Symplicity finding that the public interest favored injunctive relief. The Court stated: "[a]lthough the grant of injunctive relief will further delay GSA's procurement of a new contract, any such delay is outweighed by the public interest in ensuring that the ultimate awardee offers the 'best value' to the Government and that the GSA complies with the terms of the Solicitation and the applicable procurement regulations." Id. at 128.

The Court also ordered that a different Source Selection Authority be appointed.

On October 3, 2006, GSA filed a Motion for Reconsideration of the Court's decision. That motion was denied on February 23, 2007.

On April 25, 2007, GSA issued a letter to ISC that notified ISC that it had been included in the competitive range and requested "an extension of your current proposal." That letter also stated: "[d]o not provide any other information, as discussions are closed." ISC was given two choices, either to extend the validity period of its proposal or

withdraw its proposal even though the ISC proposal (as well as Symplicity's proposal) had last been submitted two years prior.

According to GSA, the Contracting Officer, established a new competitive range based on the initial proposals received over three years ago in June 2004. However, notwithstanding the establishment of a competitive range based on initial proposals, no discussions with ISC were held. On Friday, September 28, 2007, the last working day of Fiscal Year 2007, GSA announced the award of the contract to Symplicity for $17.5 million for the third time, based on an offer submitted two and half years prior in February 2005.

On Monday, October 1, 2007, ISC submitted a written request for a debriefing. That debriefing was held on October 15, 2007, and consisted of the GSA contracting officer reading 14 PowerPoint slides to ISC. At the conclusion of the reading, ISC was allowed to submit written questions. ISC submitted 7 written questions.

Contracting agencies are required to award contracts pursuant to the factors and sub-factors contained in the Solicitation. In this case, GSA used the best value tradeoff process described in FAR, 48 C.F.R. § 15.101-1 (2005), which allows tradeoffs among price and non-price factors and allows the Government to accept a proposal that is neither the lowest cost proposal nor the highest technically rated proposal. The Solicitation identified four technical factors which were to be weighed against cost to choose the winning proposal: Technical Approach, Management Approach, Past Performance, and Key Personnel Staffing and Experience. In addition, "Oral Presentation and Operational Capability Determination (OCD) Evaluation Factors" were to be incorporated into the offeror's technical evaluation and used to arrive at a final technical adjectival score.

Both an adjectival rating and a confidence rating were to be assigned for each factor, with each being of equal importance. The adjectival ratings were: Outstanding, Excellent, Acceptable, Marginal, and Unacceptable. The confidence ratings were: High Confidence, Significant Confidence, Confidence, Little Confidence, and No Confidence. The Solicitation also included provisions allowing GSA to eliminate a proposal on the grounds of an unrealistically low price proposal, and requiring GSA to evaluate price in order to ensure that it is realistic in light of the proposed scope and effort.

Almost immediately after award, GSA issued material modifications to Symplicity's contract. ISC was unaware of the existence of any modification to the contract until after the Court's hearing held on November 29, 2007. The second of these modifications, Modification PS02 ("Modification 2") effective November 8, 2007, was provided to counsel for ISC on December 10, 2007, in response to the Court's December 3rd order.

Modification 2 amended Symplicity's contract by removing a requirement to use BEA WebLogic and Java and mysteriously added a new section on payment, G.5 which stated: "G.5 Payment Invoicing and Payment will be performed on a monthly basis, and Invoices will reflect $1/12^{th}$ of the yearly fixed price amount." Previously, Section G of the solicitation ended with paragraph G.4, Invoice/Voucher. The new paragraph G.5 was apparently negotiated between GSA and Symplicity in order to address the fact that Symplicity wanted to be paid on an on-going basis rather than the milestone basis that was required in the Solicitation for delivery of actual services. Section L.8.3.4 of the Solicitation states in relevant part: "Offerors shall propose, in the price proposal, a milestone schedule for performance based payments tied to deliverables. The successful

offeror's schedule, after acceptance by the Government will be the basis for pricing in Section B." Section M.6 of the evaluation factors section of the solicitation repeats these instructions and states in relevant part: "Offerors shall propose, in the price proposal, a milestone schedule for performance based payments tied to deliverables. The successful offeror's schedule, after acceptance by the Government will be the basis for pricing in Section B."

Following the disclosure of Modification 2 during the third protest, the General Services Administration, without explanation but apparently based on upon the realization that the amendment constituted improper activity, issued Modification PS03 ("Modification 3"), which it provided to the parties on December 14, 2007. Modification 3 rescinded Modification 2 in its entirety. Modification 3 did not, however, delete Section G.5 from Symplicity's contract and Symplicity has, in fact, been paid for development of the system.

Payment to Symplicity according to a monthly schedule pursuant to the new Section G.5 improperly reallocated the risk of performance in this performance-based contract by providing for monthly payment regardless of performance criteria in violation of this Court's precedent.

During the consideration of the third protest by this Court and while Symplicity was being paid to develop its competing system, GSA continually sought ISC's proprietary information. As a result, ISC was forced to seek this Court's intervention twice to prevent those improper demands.

After a full briefing by the parties and oral argument, this Court again found that GSA had violated procurement law and regulations.

In its March 18, 2008 decision, this Court stated:

> The new SSA [Source Selection Authority], however, erroneously concluded that "*ISC and Symplicity both received similar technical adjectival ratings.*" AR 2561 (emphasis added). First, the new SSA was not authorized to change the ratings of the Technical Team. The new SSA's job was to *compare* the *existing technical ratings of the technical professionals* with the price analysis and incentive pan analysis and conduct a "best value" analysis…. In making his own independent assessment of the technical ratings, the new SSA reached a conclusion that is not supported by the record.
>
> * * *
>
> The new SSA's misperception of the technical ratings of ISC and Symplicity is even more apparent when the Majority Report's textual explanation is reviewed. *Compare* AR 774 (April 5, 2007 Final Technical Assessment Report Summary for ISC) ("ISC's proposal *can be expected* to produce a result that is very similar to the existing FBO. The new functionality… includes features that, while *improving the current FBO system*, are generally considered standard in contemporary web applications.") (emphasis added); *with* AR 813 (April 5, 2007 Final Technical Assessment Report Summary of Symplicity) ("Symplicity had proposed to build an application, install it on servers, keep the servers running, and answer the Help Desk phones. There is *little to no support* for outreach, training, or agency transition to a significantly different FBO. The *amount of resources* to adequately manage and provide transitions, maintenance, and support has been *grossly underestimated* … and presents a *significant risk of unsuccessful contract performance*.") (emphasis added.) Therefore, contrary to the SSA's assertion, ISC's overall technical ratings and capabilities were superior to Symplicity's.

<u>Info. Sciences Corp. v. United States</u>, 80 Fed Cl. 759 at 790-91 (2008).

In issuing injunctive relief, with regard to the balance of hardships, this Court stated:

> Although an injunction would delay GSA's effort to "acquire a contractor for comprehensive development, implementation, transition, operations[,] and support of a new Federal Business Opportunities (FBO)system (*see* AR 89), GSA has not indicated that a further delay in awarding the contract would threaten the continued operation of that FBO system, even if it may delay some enhancements…. In sum, the additional time and expense involved in requiring GSA to solicit and award the FBO contract is outweighed by the importance of this procurement being conduced in compliance with the law.

Id. at 799.

In issuing injunctive relief, with regard to the public interest and notwithstanding Symplicity's argument as cited by the Court that: "[i]t is a fair assumption that should this Court grant the relief requested and either DEVIS or ISC prevail in a subsequent source selection decision, then a fourth, fifth or sixth protest will surely follow," this Court stated: "[t]hese concerns are outweighed by the public interest of ensuring that the ultimate awardee offers the 'best value' to the Government, pursuant to the terms of the Solicitation and applicable procurement regulations." Id.

This Court also noted that GSA had made "significant modifications" to Symplicity's contract immediately after award and then "GSA revoked Modification 2 when the court became aware of this action…. The court discerns no reason why GSA cannot issue a revised Solicitation and award an FBO Contract that fully complies with the Solicitation and all applicable provisions." Id. at 800.

This Court went on to state:

> GSA's leadership has stated that:
>
>> GSA customers know when they use GSA contract vehicles they get the best value in price and service. With the "Get It Right" plan, these customers are being reassured that, along with the best prices and value, they are using a procurement system that is managed with the highest standards of ethics, effectiveness, and efficiency available.
>
> GSA, *Confidence in Contracting* (July 13, 2004)(quoting GSA Administrator Stephen A. Perry); *see also* Statement of Emily W. Murphy, GSA Chief Acquisition Officer, S. Com. Homeland Sec'y & Gov't Affairs, Subcomm. Fed. Fin. Mgmt., Govt' Info. & Int'l Sec'y (July 26, 2005)("GSA's mission and achievements are very important to the efficiency and effectiveness of the Federal government, and that we make a difference in the process of delivering good government services, and to

> the well-being of people who live in this country…GSA is the premier acquisition agency of the Federal government[.] (footnotes omitted).
>
> The court is confident that GSA can "Get It Right" by re-issuing a revised Solicitation, and awarding the FBO Contract in a manner that complies with the procedural and substantive requirements of the FAR, as soon as possible.

Id.

However, rather than maintaining the status quo and a reliable Fedbizopps system while engaging in an acquisition process that complies with procurement statutes and regulations, GSA, without notification to ISC, simply awarded a task order without competition with any other entity to Symplicity to operate Fedbizopps on March 26, 2008. This award was made through the GSA government-wide acquisition contract known as "8(a) STARS – Streamlined Technology Acquisition Resources for Services" a contract vehicle that is reserved for registered disadvantaged businesses and that allows non-competitive awards up to $3.5 million in value.

Up until the evening of March 31, 2008, ISC operated Fedbizopps under a task order awarded to SAIC.

On April 1, 2008, Symplicity began operation of Fedbizopps and utilized the intellectual property and proprietary software code of ISC that remained on the computer system at GSA without the authorization or a license from ISC.

## ARGUMENT

### I. Legal Standard

ISC has invoked the Court's jurisdiction pursuant to 28 U.S.C. § 1491(b)(1) by alleging a violation of mandatory regulations to "conduct business with integrity, fairness, and openness" (FAR, 48 C.F.R. § 1.102) and a violation of FAR 1.102-2(c)(1)

requiring contracting officers to take actions that "reflect integrity, fairness, and openness." Section 1491(b)(1) states in relevant part: "The United States Court of Federal Claims…shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract *or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*." Emphasis added.

In addition, "Tucker Act jurisdiction is conferred upon this Court when a party alleges an implied contract with the United States." Kawa v. United States, 77 Fed. Cl. 294, 303 (2007); *see also* Chevron U.S.A., Inc. v. United States, 71 Fed.Cl. 236 (2006). When subject matter jurisdiction is challenged, the plaintiff must establish jurisdiction by a preponderance of the evidence. Esch v. United States, 77 Fed. Cl. 582, 587 (2007), *citing*, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). In determining whether or not the Court of Federal Claims has subject matter jurisdiction over an action, the court will "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). ISC has alleged the elements of a valid implied-in-fact contract in its Complaint.

## II. Standard of Review

With actions under 28 U.S.C. § 1491(b)(1), the Court is to use the standards of section 706 of title 5 of the United States Code which is a review of whether an agency decision lacked a rational basis or was otherwise arbitrary and capricious. ("The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and

conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law . . . ."

Defendant also argues the need for ISC to prove "bad faith" with regard to its implied-in-fact contract breach claim. Def. Mot. at 15-16. ISC's count II alleges Defendant's breach of its implied-in-fact to deal with ISC fairly and honestly, and ISC need only demonstrate that the government acted "in an arbitrary, capricious or irrational manner." Comprehensive Health Servs., Inc. v. United States, 70 Fed. Cl. 700, 738 (2006); (*citing*, Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1132 (Fed. Cir. 1998) ("The government is said to breach the implied contract if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant." (citation omitted)).

In determining whether the government breached its implied contract, courts look to four factors laid out in Keco Indus., Inc. v. United States, 203 Ct. Cl. 566, 492 F.2d 1200, 1203-04 (1974):

> The predecessor court to the United States Court of Appeals for the Federal Circuit identified four relevant factors to help a trial court determine if a breach of the duty of good faith and fair dealing has occurred: 1) absence of a reasonable basis for the administrative decision; 2) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; 3) proven violations of pertinent statutes or regulations; and 4) subjective bad faith.

Comprehensive Health Servs., 70 Fed. Cl. at 738 (holding that bad faith was proper standard when the other three *Keco* factors do not support a breach). The Court of Appeals for the Federal Circuit more recently clarified that all four factors do not need to be present to find that the government breached its duty. Comprehensive Health Servs.,

70 Fed. Cl. at 738 (2006); (*citing*, Prineville Sawmill Co., Inc., v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) ("Accordingly, we note that the absence of any allegation of bad faith on the part of the Forest Service in rejecting Prineville's bid and cancelling the South Crater auction is not determinative."). Defendant wants the Court to impose the high standard of well-nigh irrefragable proof required to demonstrate bad faith, even though it is sufficient for ISC to demonstrate that the agency's actions violated statute or regulation or that they lacked a reasonable basis.

## III. The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Is Mandatory And Was Violated In This Instance.

Defendant argues that because the title for FAR Section 1.102 includes the words "guiding principles," the Court must conclude that the entire section is only a "performance standard" (Def. Mot. at 7) and therefore "are simply procurement guidelines that impose no mandatory duty, and therefore, by definition, cannot be violated." Def. Mot. at 7. Defendant's argument fails for at least two reasons. First, FAR 1.102(b) clearly states that "[t]he Federal Acquisition System **will**—(3) Conduct business with integrity, fairness, and openness…." Emphasis added. This obvious point has been made clear by this court: "[t]he FAR ***requires*** 'integrity, fairness and openness in procurements conducted under the Federal Acquisition System." Dynacs Eng'g Co., Inc. v. United States, 48 Fed. Cl. 124, 131 (2000) (granting plaintiff relief where agency reopened discussions with another offeror but not with plaintiff). Further support for the mandatory nature of FAR 1.102(b) is found in subsection 1.102-2(c) which states in relevant part that "each member of the Team **must** reflect integrity, fairness, and openness….[E]ach member of the Team is responsible and accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust.

Fairness and openness require open communication among team members, internal and external customers, and the public." Emphasis added; FAR 1.102-2(c)(1). The subsection also clearly states that: "[a]ll contractors and prospective contractors **shall be** treated fairly and impartially but need not be treated the same." Emphasis added; FAR 1.102-2(c)(3). In each instance, the FAR *requires* integrity, fairness, and openness of federal acquisition officials.[1]

As noted above, FAR 1.102(b) uses the word "will." The use of the word "will" denotes a *mandatory requirement* of the Federal Acquisition System.[2] "Similarly, the use of the word "must" in FAR 1.102-2(c)(1) also imposes mandatory requirements on the government officials implementing the Federal Acquisition System. FAR 2.101,

---

[1] While Defendant would read the mandatory nature of these regulations as guidelines or internal agency guidance, the FAR specifically states that "[t]he FAR System does not include internal agency guidance of the type described in 1.301(a)(2)." FAR Part 1.101. Defendant also argues that the requirement for "integrity, fairness, and openness" were merely to be a "preface" and not to be considered part of the FAR. Indeed, the statement cited by Defendant states: "[w]e encourage agencies to make this statement of core guiding principles available to program customers and contractors, and to make the core principles a part of the basic training material provided to all personnel involved in the acquisition process." Def. Mot. at 9, citing 60 Fed. Reg. 4205. However, pursuant to notice and comment, the FAR Council decided to include the requirements as an actual part of the FAR pursuant to FAR Case 95-10. 60 Fed. Reg. 34732 July 3, 1995: "This final rule amends the FAR at 1.102 to incorporate the Statement of Guiding Principles for the FAR as agreed to by the FAR Council."

[2] For example, the Court of Appeals for the Federal Circuit determined that where a Merit Systems Protection Board ("MSPB") regulation stated, "Failure of the agency to submit evidence that it has complied with the granting of interim relief . . ., or that it has provided notification that interim relief will not be granted fully . . ., will result in the dismissal of the agency's petition or cross petition for review," the word "will" imposed a mandatory requirement on the Board to dismiss an agency's petition under those circumstances. The Board subsequently amended its regulations to replace "will" with "may" to eliminate the mandatory dismissal requirement and make the Board's dismissal determinations discretionary. (emphasis in original). Guillebeau v. Dep't of the Navy, 362 F.3d 1329, 1332-33 (Fed. Cir. 2004); *see also*, DeLaughter v. United States Postal Serv., 3 F.3d 1522 (Fed. Cir. 1993).

Definitions of Words and Terms, includes an entry for "must" which cross references to "shall": "Must (see 'shall') . . . Shall means the imperative."[3]

Furthermore, FAR 1.108(f) states with regard to "Imperative sentences" that "[w]hen an imperative sentence directs action, the contracting officer is responsible for the action, unless another party is expressly cited." Because "must" means the imperative, the contracting officer for this Solicitation was responsible for acting with integrity, fairness and openness.

Defendant's argument must also fail because what it suggests is that federal acquisition officials have the discretion to choose whether or not to act with integrity, fairness, and openness. The requirement to act with integrity, fairness, and openness are not optional "guidelines" associated with the selection of bond coverage or the selection of the type of contract where discretion is afforded to contracting officials by the FAR as is the case with the cases cited by Defendant. Def. Mot. at 10-13. Rather, they are absolute requirements that when violated to the specific detriment of a prospective contractor such as ISC, provide jurisdiction in this Court and an appropriate remedy—in this case bid and proposal costs. Just because a requirement is described as a "principle" does not mean that it is not mandatory when associated with the term "will".

Because FAR 1.102 contains mandatory regulations, the violation of which has been alleged by ISC, this Court has clear jurisdiction over this matter.

---

[3] *See also* Hewitt v. Helms, 459 U.S. 460, 472 (U.S. 1983) ("shall," "will," and "must" are "language of an unmistakably mandatory character").

## IV. The Implied-In-Fact Contract Of Good Faith And Fair Dealing, Identified By The Court of Claims Some 50 Years Ago, Has Not Been Eliminated By Statute Or The Courts.

At least as far back as 50 years ago, the courts, in construing a 1919 Supreme Court case, have recognized that when the government enters into the commercial marketplace in order to procure goods and services, an implied-in-fact contract is created between the government and the offerors who would seek to do business with the government. The terms of that implied-in-fact contract include the government's promise to consider submitted offers fairly and honestly. In Heyer Products Co., Inc. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63, this Court's predecessor, when presented with a complaint that alleged that the government had no reasonable basis for the procurement decision it made, stated:

> It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted. No person would have bid at all if he had known that 'the cards were stacked against him.' No bidder would have put out $7,000 in preparing its bid, as plaintiff says it did, if it had known the Ordnance Department had already determined to give the contract to the Weidenhoff Company. It would not have put in a bid unless it thought it was to be honestly considered. It had a right to think it would be. The Ordnance Department impliedly promised plaintiff it would be. This is what induced it to spend its money to prepare its bid.
>
> That promise was broken, shamefully broken, if plaintiff's petition states the facts. If the facts there stated are true, the conclusion seems inescapable that the Ordnance Department knew from the beginning they were going to give Weidenhoff the contract. The advertisement for bids was a sham, done only to appear to comply with the law, to clothe their apparently dishonest purpose with the habiliments of legality. If these allegations are true, they practiced a fraud on plaintiff and on all other innocent bidders. They induced them to spend their money to prepare their bids on the false representation that their bids would be honestly considered.

Heyer Products Co., Inc. v. United States at 412-413.

This implied contract has been broken, and plaintiff may maintain an action for damages for its breach.

And more recently, this Court has stated:

> Before enactment of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870 (1996) (ADRA), the Court of Federal Claims' jurisdiction over a bid protest was predicated on the implied contract between the Government and prospective bidders to treat the bidder's proposal fairly, equally, and consistently with the agency's solicitation of bids. Keco Indus., Inc. v. United States, 192 Ct. Cl. 773, 780 (1970); Heyer Prods. Co. v. United States, 147 Ct. Cl. 256, 177 F. Supp. 251, 252 (1959) ("If in the instant case the [agency], in rejecting plaintiff's bid, did not act in good faith, but arbitrarily and capriciously, it breached its implied promise when it solicited bids, for the breach of which plaintiff may recover the expenses it had incurred in submitting its bid."). Although ADRA obviated the need to base the COFC's protest jurisdiction on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing. *See*, *e.g.*, Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004); Unified Architecture & Eng'g, Inc., 46 Fed. Cl. 56, 60-61, aff'd, 251 F.3d 170 (Fed. Cir. 2000). Section 1491(b) expressly provides that this Court has jurisdiction over "an action by an interested party objecting . . . to the award of a contract." 28 U.S.C. § 1491(b) (2000). The statute does not limit the legal theories on which such an "objection" to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

L-3 Communications Integrated Systems, L.P. v. United States, 79 Fed. Cl. 453, 461-462, (2007) (footnote omitted).

In between Heyer and L-3 Communications Integrated Systems, L.P., this Court has repeatedly found that its jurisdiction covered the implied contract with regard to the solicitation process engaged in by the government as well as describing its various terms. In Standard Mf. Co., Inc. v. United States, 7 Cl.Ct. 54, 58-59 (1984), the Court stated:

> The essence of Heyer Products Co., Inc. v. United States, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956), and its progeny is that, when defendant invites

> prospective contractors to respond to a request for offers to supply government procurement needs, the invitation is accompanied by the implied condition that each response will be "honestly considered," Heyer Products, 135 Ct.Cl. at 69, 140 F.Supp. 409. If the government is to be "given the benefit of the competition of the market," "each bidder is given the chance for a bargain," and the invitation necessarily gives rights to, and imposes obligations upon, both the issuer of the invitation and the bidder who responds to it. Id., 135 Ct.Cl. at 70, 140 F.Supp. 409 (quoting from United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919)).

Similarly, this Court has stated in Celtech, Inc. v. United States, 24 Cl.Ct. 269 (1991):

> … Heyer stated a broad general rule which is that every bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, ... the injured party has the right to come into court to try and prove his cause of action." Keco Industries, Inc. v. United States, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970) ("Keco I" ). Keco I confirmed that "any party who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation [has] standing to sue." Id. 192 Ct.Cl. at 779, 428 F.2d at 1237.
>
> Keco Industries, Inc. v. United States, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) ("Keco II" ), stated that the "ultimate standard" for assessing fair and honest consideration is "whether the Government's conduct was arbitrary or capricious toward the bidder-claimant." Keco II, 203 Ct.Cl. at 574, 492 F.2d at 1203. Keco II identified four general principles that control all or some of these claims: (1) subjective bad faith on the part of procuring officials; (2) lack of any reasonable basis for the administrative decision; (3) degree of discretion that applicable statutes and regulations give to procurement officials; and, possibly, (4) proof that pertinent statutes or regulations were violated. Id. at 574, 492 F.2d at 1203-04. The court added that "[t]he application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor." Id. at 574, 492 F.2d at 1204.
>
> * * *
>
> Arbitrary and capricious behavior encompasses more than favoritism or discrimination between competing bidders. The principles enunciated in Keco II embrace conduct such as bad faith, failure to make decisions on a rational basis, and violation of pertinent statutes and regulations, which may occur in either competitive or non-competitive situations.

Id. at 273-74. In this instance, GSA induced ISC to submit a proposal and to continue to expend money on the revision of its offers. A term of that inducement would be that GSA would award a contract to the offeror offering the "best value" to the government—a term noted by this Court in both of its prior decisions when discussing the factors for injunctive relief: "[a]lthough the grant of injunctive relief will further delay GSA's procurement of a new contract, any such delay is outweighed by the public interest in ensuring that the ultimate awardee offers the 'best value' to the Government and that the GSA complies with the terms of the Solicitation and the applicable procurement regulations." Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 128; and again in this Court's most recent decision in responding to the concern that additional protests might follow a fourth decision: "[t]hese concerns are outweighed by the public interest of ensuring that the ultimate awardee offers the "best value" to the Government, pursuant to the terms of the Solicitation and applicable procurement regulations." Info. Scis. Corp. v. United States, 80 Fed. Cl. 799.

GSA officials repeatedly, as determined by this Court, violated mandatory procurement regulations in repeatedly awarding the contract to Symplicity. Following the latest violation, rather than giving ISC the opportunity to earn back some of its investment by performing the services for which it was well-qualified or even continuing to compete for the opportunity to perform those services, GSA choose instead to simply disregard a competitive procurement strategy developed and followed for 4 long years and utilized another procurement vehicle to award the contract to the favored contractor, Symplicity.

There is no reasonable explanation for the government's action in this instance other than a violation of the requirements for a fair consideration of ISC's proposal. ISC never received this fair consideration. This is a case where GSA, contrary to the best interests of the public chose to award a contract to Symplicity under materially different terms having encouraged ISC to spend an enormous amount of resources pursuing the same contract. This court has jurisdiction to determine whether there was an actual breach of the contract created when the government requested offers to its solicitation and the amount of damages incurred as a result of the breach of that contract created.

## V. Defendant's Reliance On The Passage Of ADRA For The Elimination Of This Court's Jurisdiction In This Instance Is Misplaced.

Defendant cites to a number of cases of this Court in support of its proposition that ADRA eliminated this court's jurisdiction over implied-in-fact contracts. *See* Block v. United States, 66 Fed.Cl. 68, 76 (2005); S.K.J. & Associates, Inc. v. United States, 67 Fed. Cl. 218 (2005); Lion Raisins, Inc. v. United States, 52 Fed. Cl. 629 (2002). There are, of course, a number of recent decisions that arrive at a different conclusion. Aero Corp. v. United States, 38 Fed. Cl. 739 (1997); Biltmore Forest Broad. FM, Inc. v. United States, 80 Fed. Cl. 322 (2008) (citing Folden v. United States, 379 F.3d 1344 (Fed. Cir. 2004); Forestry Surveys & Data v. United States, 44 Fed. Cl. 485 (1999); Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512 (Feb. 21, 2007); Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004); HWA, Inc. v. United States, 78 Fed. Cl. 685 (2007); L-3 Commc'ns Integrated Sys. v. United States, 79 Fed. Cl. 453 (2007); Phoenix Air Group v. United States, 46 Fed. Cl. 90, 100 (2000); Unified Architecture & Eng'g, Inc. v. United States, 46 Fed. Cl. 56, 60-61 (2000), aff'd, 251 F.3d

170 (Fed. Cir. 2000) (table).[4] The Court of Appeals has declined as of yet to decide the matter. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 n.6 (Fed. Cir. 2001).

At issue is section 12 of ADRA[5] which states in its entirety:

> **Sec. 12. Jurisdiction of the United States Court of Federal Claims and the District Courts of the United States: Bid Protests.**
>
> (a) Bid Protests- Section 1491 of title 28, United States Code, is amended-
>
> (1) by redesignating subsection (b) as subsection (c);
>
> (2) in subsection (a) by striking out paragraph (3); and
>
> (3) by inserting after subsection (a), the following new subsection:
> "(b)(1) Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.
> "(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.
> "(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

---

[4] To the extent Defendant relies on these cases to argue that 28 U.S.C. § 1491(a)(1) does not provide a basis for jurisdiction, it should be noted that this Court has jurisdiction under 28 U.S.C. § 1491(b) over post-award bid-protests, and a breach of the implied-in-fact contract remains a viable cause of action. *See*, *e.g.*, Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004)

[5] The other 11 sections of ADRA deal with the reauthorization of alternative disputes methods in the federal government.

"(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.".

(b) Effective Date- This section and the amendments made by this section shall take effect on December 31, 1996 and shall apply to all actions filed on or after that date.

(c) Study- No earlier than 2 years after the effective date of this section, the United States General Accounting Office shall undertake a study regarding the concurrent jurisdiction of the district courts of the United States and the Court of Federal Claims over bid protests to determine whether concurrent jurisdiction is necessary. Such a study shall be completed no later than December 31, 1999, and shall specifically consider the effect of any proposed change on the ability of small businesses to challenge violations of Federal procurement law.

(d) Sunset- The jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress. The savings provisions in subsection (e) shall apply if the bid protest jurisdiction of the district courts of the United States terminates under this subsection.

(e) Savings Provisions-

(1) Orders- A termination under subsection (d) shall not terminate the effectiveness of orders that have been issued by a court in connection with an action within the jurisdiction of that court on or before December 31, 2000. Such orders shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked by a court of competent jurisdiction or by operation of law.

(2) Proceedings and Applications-

(A) a termination under subsection (d) shall not affect the jurisdiction of a court of the United States to continue with any proceeding that is pending before the court on December 31, 2000.

(B) Orders may be issued in any such proceeding, appeals may be taken therefrom, and payments may be made pursuant to such orders, as if such termination had not occurred. An order issued in any such proceeding shall continue in effect until modified, terminated, superseded,

> set aside, or revoked by a court of competent jurisdiction or by operation of law.
>
> (C) Nothing in this paragraph prohibits the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that proceeding could have been discontinued or modified absent such termination.

> (f) Nonexclusivity of GAO Remedies- In the event that the bid protest jurisdiction of the district courts of the United States is terminated pursuant to subsection (d), then section 3556 of title 31, United States Code, shall be amended by striking `a court of the United States or' in the first sentence.

Because the plain language of the ADRA at issue does not address the government's position that Section 12 somehow eliminated the implied-in-fact contract the government enters into when issuing solicitations, the Court is free to examine the legislative history to Section 12. United States v. The Donruss Company, 393 U.S. 297, 302, 89 S.Ct. 501, 504 (1969) (relying on legislative history to interpret the accumulated earnings tax because "the language of the statute [did] not provide an answer to the question" at issue). That legislative history clearly and unambiguously supports the position that Section 12 was enacted in order to eliminate bid protest jurisdiction of the federal district courts after a period of time, but in no way supports the proposition that the 50-year old doctrine of an implied-in-fact contract of good faith and fair dealing created when the government entered the commercial marketplace and solicited bids was being eliminated by Congress.[6]

---

[6] To the extent that Defendant relies on the concept that when Congress amends a statute, the amendment is presumed to have a purpose, the purpose, as stated in the legislative history is clear—to eliminate district court jurisdiction over bid protests.

A search of the legislative history reveals that it was the Senate that first passed Section 12 as part of it consideration of the Federal Acquisition Streamlining Act of 1994. 142 Cong. Rec. S6156, 1996 WL 315422 (June 12, 1996). However, the House of Representatives rejected the change and the provision was removed. Id.

When it came time to consider the reauthorization of ADRA, Senator Cohen[7] proposed a floor amendment during consideration of ADRA that included Section 12. In his statement, Senator Cohen makes clear that the purpose of Section 12 was to eliminate U.S. District Court bid protest jurisdiction that had been created by the D.C. Circuit in Scanwell Lab., Inc. v. Shaffer. There was no mention or discussion by Senator Cohen or others concerning the elimination jurisdiction over implied-in-fact contracts. Senator Cohen stated:

> There are two amendments to S. 1224 before the Senate for consideration. The first amendment is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims. The amendment would reverse the decision of the D.C. Circuit in Scanwell Lab., Inc. versus Shaffer (1969), that permitted bid protests to be filed in any district court across the country. Providing district courts with jurisdiction to hear bid protest claims has led to forum shopping and the fragmentation of Government contract law. Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum. Congress established the Claims Court--now the Court of Federal Claims--for the specific purpose of improving the administration of the law in the areas of patents, trademarks, Government contracts, Government employment, and international trade. Scanwell jurisdiction frustrates this purpose and deprives litigants of the substantial experience and expertise the Court of Federal Claims has developed in the Government contracting area.
>
> The Information Technology and Management Reform Act of 1996, which I authored, eliminated the authority of the General Services Board of

[7] Senator Cohen was, of course, one of the Senate experts in federal procurement law having been a co-author of the Competition in Contracting Act of 1984.

> Contract Appeals to entertain bid protests on information technology contracts and left the General Accounting Office as the single extra-agency administrative forum for such actions. My amendment to S. 1224 follows this path of reform by creating a single forum for all bid protest litigation, which will lead to the development of more uniform, and thus more predictable, law.
> Identical legislation passed the Senate as part of the Federal Acquisition Streamlining Act, but was rejected in conference. The Department of Justice and Office of Management and Budget strongly support the addition of this legislation to the ADR Act.

142 Cong. Rec. S6156 (June 12, 1996). In support of his statement and position, Mr. Cohen had inserted into the Congressional Record a letter from the Department of Justice that confirmed that what was being eliminated by Congress was the protest jurisdiction of the U.S. district courts as created by the D.C. Court of Appeals for in Scanwell Lab., Inc. *v.* Shaffer, 424 F.2d 859, 869, 137 U.S. App. D.C. 371, 381 (1969). That letter states:

> Office of Legislative Affairs,
>
> *Washington, DC, April 12, 1996.*
>
> Hon. William S. Cohen,
> *Chairman, Subcommittee on Oversight of Government Management and the District of Columbia, Committee on Governmental Affairs, U.S. Senate, Washington, DC.*
>
> Dear Mr. Chairman: The Administration supports your efforts to enact legislation that would make one small but vital improvement to the handling of bid protests arising from the award of Federal contracts--the elimination of district court jurisdiction over bid protests (the so-called Scanwell cases).
>
> In disputes between an agency and a contractor after the award of a contract, Congress has previously recognized the need for a uniform national body of law to guide both Federal procurement officials and Federal contractors. The same need for nationwide uniformity exists for bid protests. The current forum shopping between the Federal district courts and the Court of Federal Claims only encourages needless litigation in a search for the most hospitable forum, and results in disparate bodies of law between the circuits. There is simply no need to have multiple judicial bodies to review bid protests of federal contacts.
>
> In the past, Congress has recognized the need for nationwide uniformity in several areas of the law, and established the Claims Court (now the Court of Federal Claims) and the Court of Appeals for the Federal Circuit to achieve that result. Federal Courts Improvement Act of 1982 (FCIA) Pub. L. No. 97-164. The purpose of the FCIA was to improve 'the administration of the law in the areas of patents, government contracts, merit system protection, trademarks and

international trade.' H. Rep. No. 97-312, 97th Cong., 1st Sess. 17 (1981). As a result of the enactment of the FCIA, the Court of Federal Claims was made the sole judicial forum for resolution of contract disputes between the contractor and the agency. The very same need exists for nationwide uniformity in the handling of bid protests.

By eliminating the authority of the General Services Board of Contract Appeal to entertain bid protests of the award of information technology contracts, the recently-enacted defense authorization bill for fiscal year 1996 (Pub. L. No. 104-106) took a significant step forward in the handling of bid protests by leaving the General Accounting Office as the sole remaining extra-agency administrative forum. The process of procurement reform should continue by eliminating Scanwell jurisdiction, and by creating a single judicial forum to govern all bid protest litigation, both prior to and after award. While there is good reason to apply local state law, as district courts are required to do when they adjudicate torts under the Federal Tort Claims Act, it is simply inappropriate to have different interpretations of Federal contracts applied, depending upon where the contractor resides or where the contract will be performed. This results in inconsistent application of legal principles and an unwieldy body of procurement law.

Our concerns about varying results in the district courts is not hypothetical. For example, the district court in *Advanced Seal Tech., Inc.* v. *Perry,* 873 F. Supp. 1144 (N.D. Ill. 1995), disagreed with the district court's holding in *Abel Converting, Inc.* v. *United States*, 679 F. Supp. 1133 (D.D.C. 1988), regarding the burden of proof borne by the protestor to establish grounds for injunctive relief. Similarly, the district court in *Washington Mechanical Contractors, Inc.* v. *United States Dept. of the Navy,* 612 F. Supp. 1243 (N.D. Cal. 1984), disagreed with the district court's decision in *Robert E. Dereckto of Rhode Island, Inc.* v. *Goldschmidt*, 506 F. Supp. 1059 (D. R.I. 1980), regarding the quantum of proof necessary to invalidate an award of a contract. In addition, the district court in *Metric Systems Corp.* v. *United States Dept. of the Air Force,* 673 F. Supp 439 (N.D. Fla. 1987), disagreed with the holding in *Acme of Precision Surgical Co., Inc.* v. *Weinberger,* 580 F. Supp. 490 (E.D. Pa. 1984), that Federal district courts have both pre- and post-award bid protest jurisdiction. These cases show that, since Federal district court judges rarely have the opportunity to review bid protests, as might be suspected, the results vary from court-to-court.

Legislation should seek to accomplish three important goals. First, it should achieve a uniform and consistent body of precedent governing bid protests, by providing interested parties with a choice of only one administrative and one judicial forum for the resolution of bid protests. Second, it should discourage forum shopping between the remaining tribunal and court by imposing a similar, if not identical, standard and scope of review in both fora. Finally, it should impose a standard and scope of review which both recognizes the deference to the

contracting agency in conducting procurements and also limits expensive, time-consuming and resource-intensive discovery.

As Mr. Steven Kelman, Administrator for Federal Procurement Policy, testified before your subcommittee last July:

‘With its nationwide jurisdiction and contract expertise, the Court of Federal Claims could effectively and efficiently serve as a unified judicial forum operating in the national interest. This would avoid the unfairness of forum shopping. At the same time, it would not prevent small businesses from having their day in court inasmuch as the Court of Federal Claims is authorized to hold hearings throughout the country to minimize inconvenience and expense to litigants.’

In summary, the problems associated with district court bid protest activity can be effectively avoided by vesting judicial bid protests authority, both pre- and post-award, exclusively in the Court of Federal Claims and imposing a deferential standard of review and limited scope of review similar to that used by the General Accounting Office. With national jurisdiction, this court would effectively serve as a unified judicial forum with contract expertise, eliminating forum shopping and promoting the application of consistent legal principles.

We urge Congress to take immediate action to eliminate Scanwell jurisdiction in the district courts. We would be happy to work with you to ensure enactment of legislation that would meet this important objective. The Office of Management and Budget has advised that there is no objection from the standpoint of the Administration's program to the presentation of this report.

Sincerely,

Andrew Fois,
*Assistant Attorney General.*

142 Cong. Rec. S6156-57 (June 12, 1996) (footnote omitted).

Of particular note, the Scanwell case at issue did not cite to or even mention as a basis for district court jurisdiction over bid protests the implied-in-fact contract of good faith and fair dealing.[8]

[8] Scanwell found that “a contractor making a prima facie showing alleging arbitrary or capricious action, or an abuse of discretion, by an agency or contracting officer in making the award of a contract, has standing to sue in district court under the

A similar statement is found in the ADRA Conference Report:

> Section 12--House recedes to Senate amendment with modifications. This section consolidates federal court jurisdiction for procurement protest cases in the Court of Federal Claims. Previously, in addition to the jurisdiction exercised by the Court of Federal Claims, certain procurement protest cases were subject to review in the federal district courts. The grant of exclusive federal court jurisdiction to the Court of Federal Claims does not affect in any way the authority of the Comptroller General to review procurement protests pursuant to Chapter 35 of Title 31, U.S. Code.
>
> This section also applies the Administrative Procedure Act standard of review previously applied by the district courts (5 U.S.C. sec. 706) to all procurement protest cases in the Court of Federal Claims. It is the intention of the Managers to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims. This section is not intended to affect the jurisdiction or standards applied by the Court of Federal Claims in any other area of the law.

H. Rep. No. 104-841, 104th Cong., 2d Sess. 9-10 (1996).

As a result, there is no evidence either in the plain language of Section 12 or in the direct legislative history of Section 12 that Congress actually eliminated or intended to eliminate the Court of Federal Claims' jurisdiction over the implied-in-fact contract of good faith and fair dealing that had been the rule of law for 40 years by 1996. Indeed, the basis for jurisdiction of this Court over implied-in-fact contracts was left intact by Congress. *See* 28 U.S.C. § 1491(a)(1). As a result, this Court has jurisdiction over Plaintiff's claim of the breach by the government of its implied-in-fact contract with the government.

## VI. <u>ISC Has Properly Stated A Claim For Which Relief May Be Granted.</u>

ISC seeks the damages it suffered when GSA failed to conduct the procurement and evaluation with integrity, fairness and openness and for the damages it suffered when

---

Administrative Procedure Act." Andrew Fois, Letter to Senator William Cohen (April 12, 1996) *reprinted at* 142 Cong. Rec. S6155-56 (June 12, 1996).

GSA breached its implied-in-fact contract to consider it proposal fairly and honestly. The first claim for damages is specifically provided for as "bid preparation and proposal costs" as stated at 28 U.S.C. § 1491(b)(2) and the second claim is consistent with the "'longstanding precedent awarding bid preparation and proposal costs under the theory of breach of the implied contract and fair dealing'". Chevron U.S.A. v. United States, 71 Fed. Cl. at fn 18, citing Gentex Corp. v. United States, 61 Fed.Cl. 49, 54 (2004)

As noted above, this Court has twice determined that GSA failed to follow mandatory procurement regulations in evaluating and awarding a contract pursuant to Solicitation Number TQN-04-RA-0001. As determined by this Court, ISC's proposal did not receive a fair consideration. In addition, GSA chose, in a clandestine manner, to amend the awarded contract to Symplicity—again a fact previously noted by this Court—to change the fundamental basis of the award evidencing a lack of fairness and openness. Having failed, for the third time, to make an award pursuant to the Solicitation that represented the best value to the government and public and failed to comply with the terms of the implied-in-fact contract to consider proposals fairly and honestly, GSA simply chose—after 4 long years—to award a task order directly and without competition to Symplicity. ISC is not challenging that award, but is seeking damages of bid and proposal costs for having been encouraged to participate in a solicitation where the outcome was not based on a rational basis consistent with the FAR and best value for the public.

It is important to note that this is not a case where the "requirement" of the government has changed or disappeared—Fedbizopps continues to operate and began operation by Symplicity utilizing the very system that ISC had developed. Having thrice

failed to follow mandatory regulations, the government abandon without a rational basis its competitive procurement process and simply awarded the task order to Symplicity thereby breaching its contract with ISC and denying ISC any opportunity to compete for the work.

## CONCLUSION

Based on the foregoing, we respectfully request that the Court deny Defendant's motion to dismiss.

Respectfully submitted,

s/ William A. Shook
William A. Shook
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Tel: (202) 661-6256
Fax: (202) 778-9100

Date: September 2, 2008